IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ANGIE WALLER, ET AL.          §
                              §
VS.                           §    CIVIL ACTION NO. 4:15-CV-670-Y
                              §
CITY OF FORT WORTH TEXAS,     §
ET AL.                        §

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the motion for summary judgment
of defendants Merle Green and Dana Baggott (doc. 153). After
review of the motion, response, reply, related briefs, appendices,
and applicable law, the Court GRANTS Defendants' motion for summary
judgment.

## I.  FACTUAL BACKGROUND[1]

On May 28, 2013, just before 1:00 a.m., ADT Security Services
("ADT") received notice of a burglar-alarm activation at 409
Havenwood Lane North in Fort Worth, Texas, the residence of a Mrs.
Bailey. Unable to reach Bailey, ADT contacted one of Bailey's
neighbors. The neighbor informed ADT that Bailey had recently
undergone a medical procedure and asked that ADT send someone to
check on Bailey. The ADT operator then contacted the Fort Worth

---

[1] The Plaintiffs and Intervenors are collectively referred to as
"Plaintiffs" and all facts have been taken from Plaintiffs' First Amended
Complaint (doc. 41) and Intervenors' Second Amended Complaint (doc. 45).
Plaintiffs have acknowledged that both complaints "are identical in all relevant
allegations" and have filed joint responses, replies, etc. (Pls.' Resp. to Mot.
Summ. J. (doc. 176) 1 n. 1.)

Police Department ("FWPD"), stating that ADT had received a burglar-alarm notification at 409 Havenwood Lane North, the Bailey residence.

In response, the FWPD dispatched two newly trained police officers, Richard Hoeppner and Benjamin Hanlon, to respond to the burglar alarm at the Bailey residence. Though they believed they were at the correct address, 409 Havenwood Lane North, the officers actually began investigating the residence of Jerry and Kathy Waller at 404 Havenwood Lane North. Upon exiting their patrol cars, the officers walked up the Wallers' driveway together and then into the back yard. After both officers surveyed the back of the house, Hanlon went by himself to the front of the house to knock on the door. Hanlon heard dogs barking and saw a light come on inside the home and radioed Hoeppner to come around to the front at 1:06:06 a.m. Instead of waiting on Hoeppner, however, Hanlon went to the back of the house because he heard someone yelling, and there he allegedly encountered Hoeppner with his gun drawn on Jerry Waller inside the garage. The subsequent actions of Waller and the officers are in dispute and have given rise to the present lawsuit.

According to Plaintiffs, Jerry Waller was awakened by blinking lights coming from outside his home. Waller raised his overhead garage door to turn off the alarm on his vehicle, which was int the driveway, believing it to be the source of the blinking lights. When Waller raised the garage door, he encountered Hoeppner, who

shined a bright light into Waller's eyes and yelled "drop the gun."
Hoeppner did not, however, identify himself as a police officer to
Waller. Plaintiffs do not dispute that Waller had a gun when he
entered the garage, but the plaintiffs claim that Waller laid his
gun on the car's hood that was parked in the garage when told to do
so by Hoeppner. Plaintiffs further assert that Waller never reached
for his gun nor pointed it at Hoeppner once placing the gun on the
car's hood.  According to Plaintiffs, the blood-spatter evidence
from the crime-scene photographs and the autopsy report show that
Waller could not have been holding a gun when shot by Hoeppner.
Plaintiffs point to blood spatter on the left side of Waller's
face, combined with the entry-and-exit wounds sustained by Waller
on his left hand, support their contention that Waller was unarmed
and shielding his eyes from the bright lights when he was shot.
Hoeppner and Hanlon insist, however, that Waller grabbed the gun
and pointed it at Hoeppner just before Hoeppner shot and killed
Waller.  And at 1:06:50 a.m., forty-four seconds after Hanlon's
first radio transmission, he contacted the police dispatcher and
stated, "The guy came out with a gun, wouldn't put the gun down and
pointed it at Hoeppner and Hoeppner fired."

     The first officers to arrive after Waller was shot--between
six and ten minutes later--were B.S. Hardin and A. Chambers. Hardin
told investigators that he "had EMS experience" and approached
Waller to see if there were any signs of life. Hardin further

stated that Waller's hands were underneath his body when Hardin moved Waller's body to check for signs of life. Hardin also stated that he removed the gun from underneath Waller's body and placed it a few feet away for the safety of others at the crime scene. Plaintiffs also point out that the crime-scene photographs contradict Hardin's statement. Plaintiffs contend that, had the gun been under Waller's body, the gun would have had large amounts of blood on it given the amount of blood that Waller was lying in. According to Plaintiffs, though, the crime-scene photographs do not reveal any blood on the gun, but later photographs do, which appears to have come from being in contact with a bloody glove.

Plaintiffs assert that Baggott and Green mishandled the investigation and claim that each detective was complicit in covering up the unlawful shooting of Waller. In that regard, Plaintiffs claim that Baggott and Green did not aggressively question the inconsistent statements given by the officers, and were aware that Hardin allegedly removed a gun from underneath Waller's body, and that he repositioned the body in the process. And according to Plaintiffs, Baggott and Green failed to follow-up on evidence that refuted each officer's account, such as a lack of visible blood found on the gun despite being under a body that was bleeding profusely. Therefore, Plaintiffs conclude, Green and Baggott acted unreasonably in their investigation, and thus, have joined a conspiracy to cover up the unlawful actions of the other

officers.

Plaintiffs further state that "Baggott and Green, failed to obtain a warrant until after they had rummaged through the Waller residence and . . . then misrepresented to the magistrate the facts necessary to obtain a warrant . . . ." Plaintiffs also claim that Baggott and Green "undertook to alter and affect the testimony of . . . Hanlon and Hoeppner, by [asking] leading and suggestive questions and not challenging the clear inconsistencies in the [officers'] stories." Plaintiffs allege that "Baggott secretly and surreptitiously recorded a conversation with Kathy Waller while she was being treated at the Harris Hospital emergency room" after her husband was shot. Plaintiffs further state that Baggott and Green "published confidential medical information about Jerry Waller that was in no way related to the [cause of his] death." In doing so, Plaintiffs allege that Baggott and Green violated Kathy Waller's rights to privacy.

As a result, Plaintiffs have filed amended complaints, asserting claims against detectives Green and Baggott. In response, Green and Baggott have filed a motion for summary judgment under Federal Rule of Civil Procedure 56, asserting that they are entitled to qualified immunity for Plaintiffs' claims. The Court must now consider whether Defendants are entitled to qualified immunity, and thus judgment as a matter of law, when the facts are viewed in the light most favorable to Plaintiffs.

## II. STANDARD OF REVIEW

A. Summary-Judgment Standard

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant, except as to affirmative defenses, must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56 "does not impose

on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation omitted) (internal quotation marks omitted). "After the non-movant has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

B. Qualified Immunity

When a plaintiff seeks monetary damages directly from a defendant in an individual capacity for actions taken under the color of law, the defendant may invoke his right to qualified immunity. *See Hafer v. Melo*, 502 U.S. 21, 26 (1991); *Doe ex rel. Magee v. Covington Cty. School Dist.*, 649 F.3d 335, 341 n. 10 (5th Cir. 2011)(only natural persons sued in their individual capacities

are entitled to qualified immunity). The doctrine of qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine balances the important interests of holding "public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Because an official is entitled to immunity from suit, not merely from liability, immunity questions should be resolved at the earliest possible stage in the litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

To determine whether a government official is entitled to qualified immunity at the summary-judgment stage, this Court must undertake a two-pronged analysis, inquiring: (1) whether the facts that the plaintiff has shown a violation of a constitutional or statutory right; and (2) whether the right at issue was "clearly established" at the time of the defendant's demonstrated misconduct. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts have discretion, however, in deciding which of the two prongs to address first based upon the circumstances of the case. *See Pearson*, 555 U.S. at 236 (rejecting

*Saucier*'s mandatory two-step sequence); *Lytle v. Bexar Cty. Tex.*, 560 F.3d 404, 409 (5th Cir. 2009).

The right the official is alleged to have violated must be "clearly established" in a particularized sense to the context of the case. *Saucier*, 533 U.S. at 202. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. The inquiry turns on the "objective legal reasonableness of the action, assessed in the light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)).

Although qualified immunity is normally an affirmative defense, the plaintiff has the burden to negate the defense once it has been properly raised. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008); *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)(en banc). "The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority." *Brumfield*, 551 F.3d at 326 (quoting *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001)).

### III. DISCUSSION AND ANALYSIS

A.    Objections

In their response to Defendants' motion for summary judgment (doc. 176), Plaintiffs object to the Court's staying of discovery pending the resolution of the defendants' individual assertions of the qualified-immunity defense. Plaintiffs' objection is OVERRULED.[2] *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Schultea v. Wood*, 47 F.3d 1427, 1434 (5th Cir. 1995)(noting that a district court may exercise its discretion in banning discovery at the "threshold pleading stage").

Plaintiffs also object to the use of declarations made by Green and Baggott as summary-judgment evidence. Plaintiffs complain "that there has been no right of confrontation and cross-examination to test the accuracy and truthfulness of each of the exhibits attached." Plaintiffs assert that both declarations "are inadmissible hearsay which have not been shown to come within any hearsay exception." Plaintiffs do not point to specific statements in Baggott or Green's declaration that are objectionable and are offered for the truth of the matter asserted. Plaintiffs do, however, object to paragraphs seven through thirty-five of Green's declaration, noting that he "is not a competent expert in shooting

---

[2] Once any appeals have been decided by the Fifth Circuit, the Court will order the remaining parties to confer and submit a joint status report, outlining the proposed deadlines for discovery, disclosures, dispositive motions, etc. The Court will issue its initial scheduling order based on the parties' representations in their joint status report.

reconstruction." Plaintiffs are correct that Green has not been shown to be an expert "in shooting reconstruction" and the Court would be inclined to sustain the objection if Green were to use the declaration to offer such an expert opinion. But the Court reads the declaration as showing what information Green possessed during his investigation, and thus, would assist the Court in determining whether he acted reasonably based on his review of the evidence. As such, Green's declaration is admissible for that purpose. Further, to the extent that Plaintiffs object to Baggott and Green's use of declarations "in lieu of affidavits," the objection is overruled as the declarations have been made under the penalty of perjury. See 28 U.S.C. § 1746. Plaintiffs' objections related to the declarations are OVERRULED.

Next, Plaintiffs object the "unsworn audiotaped interviews of Officers Hoeppner, Hanlon and Hardin, the 'Critical Police Incident Response Forms' of Officers Chambers, Gonzales and Gierling, as well as the case notes of Detectives Baggott and Goodwin . . . ." But Plaintiffs acknowledge that all of the documents were obtained through public-information requests. As such, records would be admissible. See Fed. R. Evid. 803(8). Further, the public documents have not been offered for the truth of the matter asserted, but for the information contained in the documents that would show the information and evidence available to the detectives when conducting the investigation. As Defendants point out, Plaintiffs

attached "22 of the 26 exhibits" complained-of by Plaintiffs in their Rule 7 Reply Appendix for purposes other than to prove the truth of the matter asserted. And although Defendants have not shown that Green is the records' custodian or qualified witness, and thus, the proper official to authenticate the records, such records would likely be admissible at trial if properly authenticated under the business-records exception. See id., at 803(6); *see also Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017), *as revised* (July 5, 2017)(noting that when making a summary-judgment determination, a court may consider evidence that could be presented in an admissible form at trial, although not presently in an admissible form). Plaintiffs' objections are OVERRULED.

Plaintiffs and Defendants, alike, appear to object to the factual summaries of the opposing parties. Such objections are OVERRULED. The factual summaries are not evidence and were not considered as such by the Court.

In Defendants' objections two through seven, they ask the Court to strike or disregard several assertions made by Plaintiffs, where Plaintiffs have either added claims not previously raised or make "wild accusations" not supported by the evidence. To that end, the Court has either disregarded the assertions or addressed them further in this order. Finally, Defendants object to the declarations made by Plaintiffs' two experts. The Court SUSTAINS

the objections for the reasons stated under the Court's "Conspiracy" section of this order.

B.    Fourth-Amendment Claims

1.    Warrant

Plaintiffs allege that Green and Baggott failed to obtain a warrant before searching the Waller's property. (See Pls.' 2d Am. Compl. (doc. 45) 25.) Plaintiffs further allege that Green and Baggott "misrepresented to the magistrate the facts necessary to obtain a warrant which was not obtained until well after the crime scene had been throughly fouled and evidence destroyed." (Id.) In that regard, Plaintiffs complain of the wording used in the search-warrant affidavit based on information Green relayed to Detective Goodwin. (See Pls.' Resp. to Mot. Summ. J. (doc. 176) 31-32.) For example, Plaintiffs complain that the affidavits are misleading, in part, because they state that: (1) Kathy Waller is a "suspected party"; (2) she "has possession of and is concealing evidence of a homicide at said suspected place"; (3) the officers "inadvertently began searching 404 Havenwood Lane"; (4) the officers "encountered a subject who was armed with a handgun standing **near the corner of the home**"; and (5) the officers "identified 'theirselves' as police officers." (Id. at 32)(emphasis in original). Plaintiffs also state that the "search warrant was knowingly falsified . . . so officers could take third-parties through the residence and look for 'dirt' or uncomplimentary matters regarding the Wallers." (Id.)

Bearing in mind the principles of qualified immunity, the Court will first determine whether Defendants violated the Fourth Amendment by providing false information in the affidavit in support of the warrant application. When a plaintiff challenges the veracity of statements contained in a search-warrant affidavit in the context of a § 1983 claim, the challenge is examined under the *Franks* standard. *See Melton v. Phillips*, 837 F.3d 502, 506-07 (5th Cir. 2016), *pet. for reh'g en banc granted by*, No. 15-10604, 2017 WL 629267, at *1 (5th Cir. Feb. 15, 2017). Under 42 U.S.C. § 1983, "an officer is liable for swearing to false information in an affidavit in support of a search warrant, provided that: (1) the affiant knew the information was false or [acted with] reckless disregard for the truth; and (2) the warrant would not establish probable cause without the false information." *Melton*, 837 F.3d at 506-07 (quoting *Hart v. O'Brien*, 127 F.3d 424, 448-49 (5th Cir. 1997), *abrogated on other grounds by Kalina v. Fletcher*, 522 U.S. 118 (1997))."[A] warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165 (1978). The Fourth Amendment requires that the affiant bring forth a truthful-and-factual showing sufficient to comprise probable cause. *See id.* at 165-66. The Supreme Court, however, recognized that a truthful showing does not require "that every fact recited in the warrant

affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Id*. at 165.

First, Green appears to argue that he cannot be held liable for any false information contained in the warrant affidavit because he did not sign the warrant affidavit or warrant application. (See Defs.' Reply in Supp. of M. Summ. J. (doc. 186) 14.) Green is correct--generally an officer who does not prepare or sign the warrant affidavit may escape liability--but the officer's lack of signature is not an absolute bar for recovery. *See Melton*, 837 F.3d at 507("[I]n *Hart*, . . . we held that *Franks* liability may extend to government officials who are not the affiants.")(citing *Hart v. O'Brien*, 127 F.3d at 448-49); *see also id.*, at 513 (Elrod, J., dissenting)(noting that under Fifth Circuit precedent "an officer cannot be liable under *Franks* without providing incorrect information 'for use in an affidavit in support of a warrant.'")(citation omitted)). The Court in *Melton* explained that "*Franks* 'left open the possibility that a search or arrest violates the Fourth Amendment where the affiant relies in good faith on deliberate or reckless misstatements by another government official." *Id*. (quoting *Hart*, 127 F.3d at 448).

In the instant case, Detective Goodwin relied on information relayed to him by Green in preparation of the warrant application,

and Goodwin signed an affidavit based on Green's statements. Here, Green was involved in the preparation of the warrant, despite not being the detective that signed it. In that regard, the warrant affidavit prepared by Goodwin appears to have been solely based on the information provided by Green. Thus, the Court sees no reason to depart from the *Hart* decision and allow Green to escape liability solely because he did not sign the warrant affidavit. *See Hart*, 127 F.3d at 448-49 ("A governmental official violates the Fourth Amendment when he deliberately or recklessly provides false, material information for use in an affidavit in support of a search warrant, regardless of whether he signs the affidavit."). Doing so would allow government officials to escape liability by choosing not to sign the warrant affidavit or application despite knowingly providing false information to the affiant.

To the extent that Plaintiffs allege that Green provided false information to Goodwin for use in the warrant affidavit, Plaintiffs must show that: (1) Green knew the information he provided to Goodwin was false or that he acted with reckless disregard for the truth; and (2) the warrant would not establish probable cause without the false information. *See Melton*, 837 F.3d at 506-07 (citations omitted). Plaintiffs claim that Baggott and Green "misrepresented to the magistrate the facts necessary to obtain a warrant . . . ." (Pls.' 2d Am. Compl. (doc. 45) 25, ¶ 90.) In that regard, Plaintiffs complain of the wording used in the search-

warrant affidavit that was prepared by Goodwin, but based on
information provided by Green. (See Pls.' Resp. to Mot. Summ. J.
(doc. 176) 31-32.) As noted, Plaintiffs complain that the
affidavits are misleading, in part, because they state that: (1)
Kathy Waller is a "suspected party"; (2) she "has possession of and
is concealing evidence of a homicide at said suspected place"; (3)
the officers "inadvertently began searching 404 Havenwood Lane";
(4) the officers "encountered a subject who was armed with a
handgun standing **near the corner of the home**"; and (5) the officers
"identified 'theirselves' as police officers." (Id. at 32)(emphasis
in original). Plaintiffs also state that the "search warrant was
knowingly falsified . . . so officers could take third-parties
through the residence and look for 'dirt' or uncomplimentary
matters regarding the Wallers." (Id.)

    Despite conclusory assertions to the contrary, Plaintiffs fail
to submit any summary-judgment evidence to support their claims.
Even if the Court accepts that the information relayed by Green to
Goodwin for use in the warrant affidavit was false, Plaintiffs have
failed to submit any evidence that would support their claim  that
Green **knew** the information was materially false at time he relayed
it to Goodwin, or that he acted with reckless disregard for the
truth. Conversely, Plaintiffs and Defendants have each submitted
evidence that supports that Green arrived over an hour after the
shooting, gathered information without entering the crime scene,

then went to the Major Case office to interview Hoeppner and Hanlon. (See Pls.' Reply Appx. (doc. 150) 250; see id. at 260; see also Defs.' Appx. (doc. 155) 194-202.) And from the evidence submitted, it appears that Green provided Goodwin with the details necessary to procure a warrant before he interviewed Hoeppner and Hanlon. (See Defs.' Appx. (doc. 155) 162.) According to Goodwin's notes, he met with Green at approximately 4:00 a.m. to gather the details needed for the search warrant. (Id.) But Green began his first interview of the officers who were present during the shooting at approximately 4:21 a.m. (Id. at 196.)

When Green arrived at the Waller residence at 2:20 a.m., he noticed that Hoeppner and Hanlon had been placed in separate police cars, yellow tape was placed around the perimeter of the crime scene, and there were no officers inside the marked-off area. (Id. at 195-96.) According to Green, "[t]his is an indication that there was no conspiracy to cover up details or to invent a shared description of events." Green claims that he performed "a few tasks in the neighborhood outside of the Waller property before he left . . . and returned to the FWPD Major Case Office where he spent a couple of hours conducting interviews of Officers Hoeppner and Hanlon." (Defs.' Br. (doc. 154) 4.) While at the crime scene, Green removed the dash cam video from the police cars of Hoeppner and Hanlon, and inspected their weapons by counting the rounds of ammunition remaining in each gun. Green maintains that he did not

enter the crime scene before a warrant was issued because entry was not authorized without a warrant. (See Defs.' Appx. (doc. 155) 196.) Therefore, Plaintiffs fail to show how Green acted unreasonably in gathering information for use in the warrant affidavit, nor do they show that he entertained serious doubts as to the truthfulness of the information relayed to Goodwin.

Further, the search warrant did not violate the Fourth Amendment even if it contained false information in it. To determine whether the search-warrant affidavit violated the Fourth Amendment, the Court must "set aside the false allegations and determine whether 'the affidavit's remaining content is [sufficient] to establish probable cause.'" *United States v. Womack*, No. 15-31096, 2017 WL 89031, at *4 (5th Cir. Jan. 9, 2017), *cert. denied*, No. 16-1219, 2017 WL 1365574 (U.S. May 15, 2017)(citing *Franks*, 438 U.S. at 155–56)). "A probable cause determination is a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Thomas*, 627 F.3d 146, 159 (5th Cir. 2010)(citation omitted). Here, it is undisputed that Jerry Waller came through his garage holding a gun when he was confronted by Hoeppner. The parties also do not dispute that Hoeppner subsequently shot and killed Waller. And Plaintiffs allege that Waller complied with Hoeppner's orders to drop the weapon and

placed the gun on his car, having never grabbed the weapon again. But defendants Hoeppner and Hanlon claim that, although Waller put his gun on the car, he grabbed it and turned towards Hoeppner just before Hoeppner fired his weapon.

Regardless of which of the parties' version of facts is correct, there was still probable cause to believe that evidence of a crime--e.g., the deceased homeowner's body, missing lapel microphone, shell casings and projectiles, etc.--was present at the Waller residence. Thus, even if the complained-of language in the warrant affidavit were stricken, there still would have been probable cause to support the magistrate's issuance of a search warrant. Accordingly, the Court concludes that Plaintiffs' claim that Green violated the Fourth Amendment for his involvement in procuring a search warrant based on the alleged false information that he provided should be and hereby is DISMISSED.

To the extent Plaintiffs claim that Baggott is liable for her involvement in the warrant preparation, such a claim is DISMISSED. Plaintiffs fail to provide any summary-judgment evidence that would show that Baggott provided any false information to Detective Goodwin for use in his warrant affidavit. (See Defs.' Appx. in Supp. M. Summ. J. (doc. 155) 150; see id. [Baggott's Dec.] at 192.)

2. Invasions of Privacy

To the extent that Plaintiffs intend to bring a claim against Green and Baggott for the police-union attorneys' having access to

the crime scene minutes after the shooting of Waller, (see 2d Am. Compl. (doc. 45) 17), such a claim is DISMISSED. Plaintiffs claim "that within fifteen minutes of this police shooting, an attorney from the police union arrived prior to police investigators and . . . was given full access to the crime scene." (See Am. Compl. (doc. 41) 9.) Plaintiffs fail to submit, however, any summary-judgment evidence that would show that either Green or Baggott allowed the attorneys to enter the crime scene before the search warrant was issued. And it appears that Baggott never went to the Waller residence, nor participated in any investigative search. (See Defs.' Appx. (doc. 155) 190, ¶ 6.)

From the evidence submitted, it appears that Green was the detective who allowed an attorney to be present at the crime scene, but not "fifteen minutes" after the shooting or before a search warrant issued. The shooting occurred at approximately 1:06 a.m., but Green claims he did not arrive at the crime scene until approximately 2:20 a.m., which appears to be supported by other officers' accounts and police logs. (See id., at 195; see also Pls.' Reply Appx. (doc. 150) 250, 260.) Although Plaintiffs claim that union attorneys were given access to the crime scene fifteen minutes after the shooting and before investigators arrived, Plaintiffs do not claim that Green granted access before his arrival, nor do Plaintiffs submit any evidence that would show Green did so. The Court does not question whether a police-union

attorney was present near the crime scene minutes after the shooting, (see Pls.' Reply Appx. (doc. 150) 388-89.), but Plaintiffs fail to show that the attorney **had actual access** to the crime scene "minutes" after the shooting and before a warrant issued. None of the various critical-incident reports from paramedics or officers on the scene mention that an attorney was present inside the crime-scene area. (See id. at 144-50, 250-61.) Green also states that when he arrived at the Waller's residence, the crime-scene's perimeter was marked by yellow tape and no one was present inside the perimeter. (See Defs.' Appx., at 195-96.) According to Green, he "did not enter the blocked off crime scene . . . because there was not yet a search warrant that would have authorized entering the property. Id.; see Mincey v. Arizona, 437 U.S. 385, 395 (1978)(holding that "the warrantless search of [the defendant's] apartment was not constitutionally permissible simply because a homicide had recently occurred there"). And according the crime-scene log, (see id., at 250-51), the police-union attorney "entered" the crime scene at the time of the walkthrough at approximately 9:24 a.m.[3]  And although it may be disturbing--and frankly, an alarming police practice--that a union attorney may

_____

[3] The "Crime Scene Log" appears to show everyone who entered the crime-scene area under the subheading: "All Personnel At Scene (Include above personnel and all persons **entering** or assigned to crime scene)" (emphasis added). As previously noted, the "Crime Scene Log" would likely fall within the business-record exception to the rule against hearsay, and thus, be admissible at trial if properly authenticated. See Fed. R. Evid. 803(6).

have been allowed to discuss the events with Hoeppner and Hanlon before Green interviewed them, the Court is not aware of such discussions implicating the Fourth Amendment rights of Plaintiffs when the discussions appear to have taken place outside of the restricted crime-scene area. Thus, Plaintiffs' claim that Green granted the police-union attorneys access to the crime scene before Green (an investigator) arrived must also be dismissed.

Liberally construed, Plaintiffs appear to generally allege that Green allowed Hoeppner and Hanlon's attorneys to have access to the crime scene. (See 2d Am. Compl. (doc. 45) 17) In their response to Defendants' motion for summary judgment, Plaintiffs expand upon their theory by arguing that Green's allowing of third parties--the officers' attorneys--to be present during execution of a search warrant violated the Fourth Amendment. (See Pls.' Resp. in Opp. (doc. 176) 35.) Plaintiffs further contend that it was clearly established at the time that Green allowed the officers' attorneys to "walk-through" the crime scene, that such a third-party presence would violate the Fourth Amendment. Green does not dispute that he allowed the attorneys to be present during the walk-through with Hoeppner and Hanlon, but Green claims that he did so to protect the officers' constitutional rights. (See Defs.' Reply (doc. 186) 15-16; see also Defs.' Appx. [Green Dec.](doc. 155) 196-97.) Green points out that the two officers "faced potential charges and . . . were entitled to legal counsel because of this." (Id.) Thus,

Green contends that the officers "had a Fifth Amendment right against self-incrimination and a Sixth Amendment right to counsel." (Id.)

Plaintiffs contend that *Wilson v. Layne*, 526 U.S. 603 (1999), supports their claim that Green violated the Fourth Amendment by allowing Hoeppner and Hanlon's attorneys to be present during Green's walk-through questioning of the officers at the crime scene even after the search warrant was issued. Green counters by arguing that *Wilson* is distinguished by the facts present here, and thus, Plaintiffs exaggerate *Wilson*'s reach. In *Wilson*, the Supreme Court held that allowing "members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home [is] not in aid of the execution of the warrant" violates the Fourth Amendment. *Id*. at 614. The court recognized, however, that "the presence of third parties during the execution of a warrant may in some circumstances be constitutionally permissible." *Id*. at 613. Therefore, the presence of a third party during execution of a warrant is not a bright-line violation of the Fourth Amendment. *See id.* (noting that the media photographers were present during the warrant execution for their own purposes and not present for the protection of the officers). Thus, *Wilson* suggests that a third-party presence for the protection of the officers may be constitutionally permissible.

Turning to the present case, Green argues that the Fifth and

Sixth Amendments necessitated that Hoeppner and Hanlon have legal counsel present when questioned by Green at the crime scene. Green also states that the two officers faced "potential charges" at the time of the walkthrough for their role in Waller's death. (See Defs.' Appx. (doc. 155) 196-97, ¶ 11.) This argument is bolstered by the fact that Green gave the evidence gathered during his investigation to a criminal district attorney to present to a grand jury. The crux of Plaintiffs' argument, however, is that Green allowed Hoeppner and Hanlon's legal counsel to "participate[] in the walk-through despite . . . [knowing] that [the] warrant . . . was only directed to law enforcement officers and not to any third-parties." (Pls.' Resp. (doc. 176) 35.) The parties do not cite any cases that address a lawyer's presence at a crime scene, but the constitutionality of such a presence must be examined.

Under the Fourth Amendment, a search is unconstitutional "[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement . . . ." *Wilson*, 526 U.S. at 611 (citation omitted). "While this does not mean that every police action while inside a home must be explicitly authorized by the text of the warrant . . ., the Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion." *Id.* Other courts, including the Supreme Court in *Wilson*, have noted that a third-

party presence during execution of a warrant is not necessarily proscribed by the Fourth Amendment.[4] The distinction, however, lies within the purpose of the third-party's presence at the crime scene. Here, the purpose of the presence of Hoeppner and Hanlon's attorneys at the crime scene during a walkthrough was for the protection of the officers. And although an argument could be made that the attorneys were present under a self-serving interest, *see id.*, at 613, a valid law-enforcement purpose was served by the attorneys' presence. *See Sampson v. Gee-Cram*, 655 F. App'x 383, 391 (6th Cir. 2016)(unpublished) (noting that "[n]othing in . . . *Wilson* suggests that the mere existence of some self-interest on the part of the [third party] . . . rendered the defendant officers' actions unconstitutional.")

As Green points out, he "certainly needed to conduct an investigation of Mr. Waller's shooting death." (Defs.' Reply (doc. 186) 15.) Detective Green brought the officers back out to the crime scene to conduct a walkthrough to likely refresh the memory of the officers and gain a better understanding of the

---

[4] *See, e.g., Wilson*, 526 U.S. at 611-12 ("Where the police enter a home under the authority of a warrant to search for stolen property, the presence of third parties for the purpose of identifying the stolen property has long been approved by this Court and our common-law tradition."); *Bellville v. Town of Northboro*, 375 F.3d 25, 33 (1st Cir. 2004)(noting that civilian presence during execution of a warrant does not automatically violate the Fourth Amendment, but "the officers must have some demonstrable need for the presence of the civilian" and "[t]he civilian must have been serving a legitimate investigative function."); *United States v. Sparks*, 265 F.3d 825, 832 (9th Cir.2001)("Where the civilian participating in the execution of a search warrant is the victim of a theft who has been requested by police to point out property that has been stolen from the victim, the courts have unanimously held that the civilian's presence did not affect the propriety of the search.")(citation omitted).

circumstances surrounding the police shooting, while also visualizing the content of the officers' statements. Given the "potential charges" that the officers faced, the officers may not have returned to the scene, or have spoken openly with Green about the events in question. Without the officers' cooperation (aided by the presence of their legal counsel), Green would likely not have been able to conduct as thorough of an investigation as he did. Thus, the attorneys' presence during the walkthrough was reasonable and likely furthered Green's investigative objectives. *See Roaden v. Kentucky*, 413 U.S. 496, 501 (1973)(cautioning that the Fourth Amendment should not be read in a vacuum and that what is reasonable in one setting may be unreasonable in another); *see also Hunsberger v. Wood*, 583 F.3d 219, 221 (4th Cir. 2009) (noting that *Wilson* is not a blanket prohibition and "that courts must undertake case-by-case inquiries into whether a third party's presence is 'related to the objectives of the authorized intrusion.'")(quoting *Wilson*, 526 U.S. at 611); *Cf. Bills v. Aseltine*, 958 F.2d 697, 702 (6th Cir. 1992)(finding a Fourth Amendment violation because "[the civilian] was present, **not in aid of the officers or their mission**, but for his own purposes involving the recovery of stolen . . . property not mentioned in any warrant.")(emphasis added).

Further, when addressing a search under the Fourth Amendment, "the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515

U.S. 646, 652 (1995). And "where there was no clear practice, either approving or disapproving the type of search at issue . . . whether a particular search meets the reasonableness standard 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id*. at 652-53 (citation omitted). Under the facts presented here, none of the parties argues that Hoeppner or Hanlon had a right to be present during the walkthrough. The search warrant was directed to "any Peace Officer of Tarrant County" and allowed for the officers "[t]o photograph and diagram the home and property for recording the crime scene." (See Pls.' Reply Appx. (doc. 150) 155.) Having the officers present to answer Green's questions assisted Green's investigation by allowing him to see exactly where the officers said they were positioned as the shooting unfolded. The lawyers' presence simply ensured that the constitutional rights of the officers were protected. There is no evidence submitted that would suggest that the lawyers were allowed in any area outside of the garage, where the shooting occurred. Further, there is no evidence to suggest that the lawyer was allowed to search the home or participate in looking for evidence of a crime, nor is there any evidence that the lawyer used any kind of recording device while present. Thus, when examining the totality of the circumstances and balancing the minimal intrusion of Green's allowing the lawyer to be present during the walkthrough

against the protection of constitutional rights of the officers, the Court concludes that Green's actions were objectively reasonable, and thus, did not violate the Fourth Amendment.

Recognizing that the nature of the attorneys' presence during the crime-scene walkthrough is a close constitutional question, the Court will assume, *arguendo*, that the presence of legal counsel at the crime-scene walkthrough violated the Fourth Amendment. Even assuming that Green violated the Fourth Amendment, he is, nonetheless, entitled to the protection of qualified immunity because the nature of the intrusion was not clearly established at the time of the violation. For a right to be clearly established, it "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right . . . [meaning that] existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012)(citations omitted)(internal quotation marks and alterations omitted). The clearly-established standard, however, does not require that a case be directly on point, but the official must be given fair warning that his actions violate the law. *Morgan v. Swanson*, 659 F.3d 359, 412 (5th Cir. 2011)(en banc)(Elrod, J., concurring). This standard "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can 'reasonably . . . anticipate when their conduct may

give rise to liability for damages.'" *Reichle*, 566 U.S. at 664.

Plaintiffs rely exclusively on *Wilson* and *Carr v. Montgomery County, Texas*, 59 F. Supp. 3d 787 (S.D. Tex. 2014), to support their contention that the presence of the officers' attorneys violated the Fourth Amendment, and that a prohibition of such a presence was clearly established. Although *Carr* was decided after the events in question, the facts are similar to *Wilson*, but distinguishable from the facts presented here. In both *Wilson* and *Carr*, the third-party presence not mentioned in the warrant involved media members who filmed the officers' execution of the search.[5] Both decisions concluded that because the media members were not named in a warrant and were present for private purposes, such a third-party presence violated the Fourth Amendment. Neither case addressed whether a third-party presence, such as a lawyer, would be deemed a Fourth Amendment violation if such a presence were needed to protect the constitutional rights of the officers. Nevertheless, the Court must determine whether existing precedent would have given Detective Green "fair warning" that such a third-party presence was constitutionally impermissible. When determining whether an officer was provided fair warning that his actions violated a constitutional right, the Court must first look to the

---

[5]It should be noted that *Carr* addressed a warrantless search in which media members were allowed to accompany the searching officers, but *Wilson* involved media members who were not listed in a search warrant, but accompanied the officers during the search.

Supreme Court and existing Fifth Circuit precedent. *Morgan*, 659 F.3d at 412 (citing *Pearson*, 555 U.S. at 244). The Court "need only consider other circuits 'in the absence of directly controlling authority.'" *Id*. at 412-13 (citations omitted).

As previously indicated, the parties have not cited any cases that address a lawyer's presence at the crime scene. Having found no Supreme Court or Fifth Circuit cases on point, the Court looked, but found only one other case addressing the presence of a lawyer, and that was during enforcement of a writ of execution. In *Bray v. Planned Parenthood Columbia-Willamette, Inc.*, 746 F.3d 229 (6th Cir. 2014), United States marshals executed a writ to seize property from Bray to satisfy a judgment obtained against him by Planned Parenthood. The writ authorized "a representative" from Planned Parenthood to participate in the execution to assist in identification of the property subject to seizure. Planned Parenthood sent "multiple unauthorized representatives," including attorneys who videotaped the inside of the home during the execution. The Sixth Circuit concluded that because "the presence of additional representatives of [Planned Parenthood] was not authorized, and because the writ made no provision for the use of a camera, it was a violation of the Fourth Amendment to permit the organization to film the home." *Id*. at 237. Relying on *Wilson*, the Court concluded that

the right to be present in a home does not necessarily

> entitle police to bring photographers with them. *Id*. In
> this case, the unauthorized filming of the Brays' home
> was particularly unreasonable because the raid was
> unannounced and the filming occurred within the home
> itself. Moreover, because of the location and nature of
> the filming, the use of the camera posed a heightened
> risk of intimidating the family and capturing its
> intimate, unguarded moments.

*Id*. Although the Court concluded that the Fourth Amendment had been

violated, the Court further concluded the constitutional rights

were not clearly established at the time of the violations. *See id*.

at 238 (reasoning that "the legal and factual scenario presented in

this action is not identical to any the Sixth Circuit or the

Supreme Court has previously addressed, . . . [and thus] a

reasonable officer could have believed that his conduct was

lawful.").

Although *Bray* involved a third-party lawyer's presence during

a writ execution, the facts in *Bray* are more closely aligned with

the facts in *Wilson* and *Carr*. Each case involved a third party who

intruded upon individual constitutional rights by filming the

event. Under each scenario, the third party was allowed to roam

throughout the residence for only a private purpose. Here, the

attorney present was confined to the garage, where the shooting

occurred, and was present only to preserve the constitutional

rights of the officers being questioned during the walkthrough. And

there is no evidence submitted suggesting that the attorney filmed

any portion of the walkthrough, or that he participated in the

search of the home. Thus, it was reasonable for Green to believe that a lawyer present at the crime scene--but contained strictly to the garage area--did not violate a constitutional right of Kathy Waller, in light of the fact that Green was authorized to investigate the crime scene under a valid search warrant. At best, Green should have recognized the competing constitutional interests, but even so, could not have been expected to determine whose rights were superior under the circumstances. Accordingly, the Court concludes that Green did not have "fair warning" that his conduct violated a clearly-established right under existing precedent. *See Pearson*, 555 U.S. at 244 ("The principles of qualified immunity shield an officer from personal liability when an officer reasonably [would have believed] that his or her conduct complies with the law.").

Next, Plaintiffs appear to allege that Baggott violated the Fourth Amendment by invading Kathy Waller's privacy when Baggott "surreptitiously" recorded her interview with Kathy Waller at Harris Hospital emergency room. (See 2d Am. Compl. (doc. 45) 26, ¶ 92.) Besides the fact that police officers may intercept communications in which the officers are a party to the communications, see 18 U.S.C. § 2511(2)(c), Plaintiffs fail to demonstrate that Waller's statements to Baggott in a busy emergency-room area are protectable under the Fourth Amendment. "In order to claim the Fourth Amendment's protection, [the aggrieved

party] must have 'a legitimate expectation of privacy in the invaded place.'" *United States v. Iraheta*, 764 F.3d 455, 461 (5th Cir. 2014)(quoting *United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir.2011)). The aggrieved party's "expectation must be 'personal[]' and 'reasonable,' and it must have a 'source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id*. (citations omitted). Thus, the aggrieved party's standing "depends on 1) whether [such a party] is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and 2) whether that expectation of privacy is one which society would recognize as [objectively] reasonable." *Id*. (citations omitted).

Under the facts presented here, Detective Baggott recorded a brief interview of Kathy Waller while in the emergency room at Harris Hospital. (See 2d Am. Compl. (doc. 45) 16-17, 26.) From listening to the audio recording of the interview, it appears that Baggott was a party to the interview. (See Defs.' Appx. (doc. 155) 204.) None of the parties contest that Baggott conducted this interview. (See id., at 190; see also Pls.' Reply Appx. (doc. 150) 164.) In her declaration, Kathy Waller acknowledges that Baggott was not in a police uniform, but that she "came to the hospital claiming that she was a Fort Worth police detective." (Pls.' Reply Appx. at 165.) Plaintiffs argue, however, that Baggott did not

obtain consent to record the interview. But the failure to obtain consent is not dispositive here.

Under established law, law-enforcement officers need not obtain consent before making audio recordings of their--or of their informant's--conversations with others. *See* 18 U.S.C. § 2511(2)(c); *see also United States v. White*, 401 U.S. 745, 751 (1971)(noting that law enforcement's recording of conversations had with a defendant, but unbeknownst to that defendant, "[did] not invade the defendant's constitutionally justifiable expectations of privacy"); *United States v. Brathwaite*, 458 F.3d 376, 380 (5th Cir. 2006)("It is clear that audio surveillance by or with the consent of a government informant does not constitute a search.") Here, Kathy Waller declares that Baggott claimed to be a police detective, yet Waller openly discussed the events of the day. From listening to the audio of the interview, there appears to have been numerous individuals present in the emergency-room area, as other voices and activities can be heard from the audio recording. Plaintiffs fail to show that Kathy Waller had a reasonable expectation of privacy of any statements she made during the interview with Baggott. *See Katz v. United States*, 389 U.S. 347, 361 (1967)(Harlan, J., concurring)(noting that "statements that [one] exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited, [and] . . . conversations in the open would not be protected against being

overheard, for the expectation of privacy under the circumstances would be unreasonable."). Accordingly, Plaintiffs' claims against Baggott for the recording of the interview with Waller must be dismissed.

Next, the plaintiffs appear to allege that Green and Baggott committed an invasion of privacy because each was "present at the autopsy and published confidential medical information about Jerry Waller that was in no way related to the Jerry Waller death by gunfire." (See Pls.' 2d Am. Compl. (doc. 45) 26, ¶ 91.) But Plaintiffs appear to clarify that it was actually Chief Halstead that published the private medical information in his press conference. (See Pls.' Resp. (doc. 176) 43.) Plaintiffs do not, however, address such a claim by citing case law akin to the alleged violation or even a statute for support. Therefore, it is unclear under what theory Plaintiffs seek recovery. The Court-- like the defendants--understands the plaintiffs to allege that Green and Baggott committed an invasion of privacy by publishing or releasing medical information, and thus, violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. No. 104-191, 110 Stat.1936 (1996)(codified primarily in Titles 18, 26 and 42 of the United States Code). The Fifth Circuit has previously stated that no private cause of action exists for HIPAA enforcement. *See Acara v. Banks*, 470 F.3d 569, 572 (5th Cir. 2006)(holding that "there is no private cause of action under HIPAA

and therefore no federal subject matter jurisdiction over [Plaintiffs'] asserted claims."). Accordingly, the Court dismisses Plaintiffs' claims against Green and Baggott for the alleged release or publishing of Jerry Waller's medical information.

Plaintiffs also appear to add an allegation in their response brief that Green and Baggott violated the Fourth Amendment by invading Kathy Waller's privacy by accessing her medical records. (See Pls.' Resp. (doc. 176) 42.) Although Plaintiffs do not cite any case law to support their new claim, it appears that Plaintiffs contend that Green and Baggott did not have probable cause to believe that Kathy Waller "had any involvement in the shooting," and thus, violated her right to privacy by requesting her medical records. (See Pls.' Resp. at 44.) But as Defendants point out, claims that are not alleged in the amended complaints, but added in a response to a motion for summary judgment should not be considered by the Court and must be dismissed. *See Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005)("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."). As such, the Court concludes that the new invasion-of-privacy claim against Baggott and Green for accessing Kathy Waller's medical records should be and hereby is DISMISSED.

C.   Denial-of-Access Claims

The Supreme Court has recognized two types of denial-of-access

claims: (1) a forward-looking claim, and (2) a backward-looking claim. *See Christopher v. Harbury*, 536 U.S. 403, 413 (2002). Under a forward-looking claim, the remedy sought is to enjoin the "official action [that] is presently denying an opportunity to litigate . . . ." *Id*. at 413. "The justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id*. But under a backward-looking claim, the plaintiff seeks redress for the official action that caused "the loss of an opportunity to sue." *See id*., at 414. "These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id*. "It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Id*. at 415.

Plaintiffs have pled both forward-looking and backward-looking denial-of-access claims against several officers including Green and Baggott. (See generally, 2d Am. Compl. 24-28 (doc. 45) First, Plaintiffs plead a forward-looking claim: that their right of access to the courts was delayed for eight months because the officers' statements, the crime-scene photographs, and the autopsy report were withheld from them while the shooting was being

investigated further.

Defendants respond by pointing out that any impediment to the filing of a lawsuit based on the withholding of evidence was removed once the evidence was given to Plaintiffs (as they admit it was) through their public-information requests. Thus, Defendants insist that long before Plaintiffs filed this lawsuit, they ceased any official action that could be said to deny Plaintiffs an opportunity to litigate a claim for excessive force under Section 1983. After all, Defendants point out, Plaintiffs are here, before this Court, adducing into evidence the very items they objected to being withheld. The Court agrees. Under these facts, which are essentially agreed to by the parties, Plaintiffs have no valid forward-looking claim for an unconstitutional denial of access to the courts, so Green and Baggott's motion for summary judgment as to Plaintiffs' forward-looking claim is GRANTED.

Plaintiffs appear to allege a backward-looking claim against Green and Baggott for being complicit with other officers in taking steps to deny Plaintiffs access to the courts by violating the integrity of the crime scene, failing to challenge inconsistencies in Hoeppner and Hanlon's recollection of the shooting, suggesting answers to Hoeppner and Hanlon in an effort to hide the truth, and destroying physical evidence. (See 2d Am. Compl. (doc. 45) ¶¶ 89-90.) Plaintiffs fail to submit, however, any summary-judgment evidence that would show that Green took steps to unlawfully deny

the plaintiffs access to the courts, that he ignored evidence, or that he acted unreasonably outside of his professional discretion when questioning the implicated officers. Plaintiffs do point to the wound on Waller's left hand, combined with entry-and-exit wound information in the autopsy report, to conclude that Waller could not have been holding a gun when Hoepnner shot him, and thus, Plaintiffs conclude, that Green ignored what the evidence should have shown him. But Green acknowledges the lefthand wound and declares that:

> Assuming that the blood on his right palm is blood spatter, and also recognizing that the wounds to Waller's left hand are inconsistent with Waller holding a gun in his left hand at the time his hand was shot, does not mean that Waller could not have been holding a gun at the time a shot or shots were fired at him. I think a reasonable possibility is that Waller may have dropped the gun as a shot or shots were fired at him, and before his left hand was hit or right had received splatter. If so, then one or both of his hands, which at one time held a gun would have been empty while other shots were fired at Waller by Officer Hoeppner.

(Defs.' Appx. (doc. 155) 199, ¶ 22.) In reviewing the interviews of the officers, Green asked follow-up questions to have the officers clarify their responses. Green further recognized the officers' stories had some inconsistencies, but also concluded that the stories generally matched. Green also questioned Hardin about why he removed the gun from underneath Waller's body. Hardin claimed that when he arrived, he found Hoeppner and Hanlon with their guns still pointed at Waller, and that he was told that there was a gun

underneath Waller. Hardin stated that he removed the gun to "secure it" from someone not known to be dead yet. Green concluded that the securing of the weapon by Hardin was reasonable. (Id., ¶ 28.) Green also declares that he when arrived at the crime scene at around 2:20 a.m., he observed that the perimeter of the crime scene was secured by crime-scene tape and that no one was inside the taped-off area. (Id., ¶ 6.) Green states that Hoeppner and Hanlon were in separate squad cars, which is common practice to limit the witnesses' ability to discuss events with each other, and that the fact that this had been done was an indication that there was "no conspiracy to cover up details or to invent a shared description of events." (Id.) Further, upon completing his investigation, Green gave the evidence to the district attorney's office to examine and present the case to a grand jury. Simply put, the plaintiffs have failed to show that Green unlawfully denied Plaintiffs access to the courts nor do they show that he acted objectively unreasonably in conducting his investigation of the shooting of Waller. Thus, the Court concludes that Green was acting within his discretion as a detective is entitled to qualified immunity for Plaintiff's backward-looking claim. *Williams v. Bramer*, 180 F.3d 699, 702-03 (5th Cir.), *decision clarified on reh'g*, 186 F.3d 633 (5th Cir. 1999)("Qualified immunity shields an official performing discretionary functions from civil damages liability, provided his actions meet the test of objective legal reasonableness.")(citing

*Harlow*, 457 U.S. at 819)).

To the extent Plaintiffs claim that Baggott took actions to deny them access to the courts, such a claim is dismissed because the Plaintiffs have abandoned the claim by failing to defend it in their response to Defendants' motion for summary judgment. *See Vela v. City of Houston*, 276 F.3d 659, 678 (5th Cir. 2001)(noting that a party abandons a claim by failing to defend such a claim against a motion for summary judgment).

D.   Conspiracy under 42 U.S.C. § 1983

"A conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all defendants without regard to who committed the particular act, but 'a conspiracy claim is not actionable without an actual violation of section 1983.'" *Morrow v. Washington*, 672 F. App'x 357, 353 (5th Cir. 2016)(quoting *Hale,* 45 F.3d at 920). When addressing a conspiracy claim in the qualified-immunity context, the Court must "first . . .  determine the objective reasonableness of the state action which is alleged to have caused harm to the plaintiff." *Id*.(citation omitted). "Only if that action was not objectively reasonable should the court then 'look to whether the officer's actions were taken pursuant to a conspiracy.'" *Id*. (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990), *abrogated on other grounds by Martin v. Thomas*, 973 F.2d 449, 455 (5th Cir. 1992)).

To the extent Plaintiffs claim that Baggott joined in the conspiracy to deny access to the courts, such a claim is dismissed because the Plaintiffs have abandoned the claim by failing to defend it in their response to Defendants' motion for summary judgment. *See Vela*, 276 F.3d at 678. In that regard, Plaintiffs make only two conclusory assertions in their response that "Baggott clearly knew . . . [there] was an unjustified use of deadly force" and that "Baggott falsified the affidavit." (See Pls.' Resp. (doc. 176) 33.) As noted previously, the evidence submitted indicates that Baggott took no part in preparing the affidavits. Without more, the plaintiffs have not shown that Baggott took part in the alleged conspiracy.

Plaintiffs do, however, defend their claims against Green for his alleged role in the cover up. (See id., at 36-42.) The Court previously held that Plaintiffs have plausibly stated a claim that Hoepnner violated § 1983 by using unlawful deadly force against Jerry Waller. The Court must now examine whether Plaintiffs have shown that Green acted objectively unreasonably in his investigative efforts, and thus, whether Plaintiffs have shown that he conspired with others in an effort to cover up the alleged unlawful shooting of Waller. To prevail on a claim for conspiracy under § 1983, "a plaintiff must establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the

conspiracy." *Pfannstiel*, 918 F.2d at 1187. "A claim for civil conspiracy has five elements: (1) two or more persons; (2) have an objective to be accomplished; (3) a meeting of the participants' minds on the objective or course of action; (4) one or more unlawful, overt acts; and, (5) resulting damages." *Meineke Discount Muffler, v. Jaynes*, 999 F.2d 120, 124 (5th Cir. 1993)(citation omitted).

The crux of Plaintiffs' arguments are that Green mishandled the investigation and ignored what the evidence showed him--that Waller was not holding the gun when Hoepnner shot him--and thus, assisted in a conspiracy to cover up the unlawful shooting. To support their claim, Plaintiffs assert that the crime scene was not preserved, which compromised the evidence. (See Pls.' Reply (doc. 149) 22.) Plaintiffs also claim that the crime-scene photographs show bloody footprints,(see id.), and that the photographs depict "clear evidence of Mr. Waller's body being re-positioned post mortem from the bloodstains present on the garage floor." (Id. at 24.) Plaintiffs also note that there was no blood on the gun allegedly used by Waller, and the lack of blood shows the gun could not have been in Waller's hand, nor underneath Waller's body after he was shot. (See 2d Am. Compl. 12-14.) Plaintiffs point to the amount of blood on the garage floor underneath Waller's body versus the lack of visible blood on the gun to support their claim. (Id.; see also Pls.' Reply 20, 36.) Plaintiffs infer that it would be

unlikely that Hardin could remove the gun from underneath Waller's body without there being a considerable amount of blood on the gun. Plaintiffs also reference blood smears that seem to show that Waller's left arm--the one allegedly holding the gun--had been moved laterally.

According to Plaintiffs, the combination of the crime-scene photographs, autopsy report, officer Hardin's alleged removal of the gun from underneath Waller's deceased body, and the officers' inconsistent statements should have been enough to show Green that the officers involved were covering up the unlawfulness of their actions. Plaintiffs seem to claim, and ask the Court to infer, that Green did not conduct an impartial investigation, but took measures to further cover up the shooting. (See generally, Pls.' Resp. (doc. 176) 36-42.)  For example, Plaintiffs claim that Green submitted "two cryptic affidavits" that asserted an investigation was ongoing, when he knew the investigation had been completed, and that submission of the case to the district attorney's office was delayed "until November or December 2013" because of the negative public reaction. (See id., at 36.)

To support their claims, Plaintiffs have submitted the declarations, preliminary reports, and resumes of two experts, Edward E. Hueske and Robert W. Taylor. (See Pls.' Resp. Appx. (doc. 177) 33-147.) The two experts give opinions about the evidence, and each opinion closely resembles the plaintiffs' assertions.  In

Hueske's report, he opines that the evidence supports the conclusion that Jerry Waller was unarmed when shot by Hoeppner. Hueske contends that the blood spatter located on the hands and face of Waller show that Waller was not holding a gun when shot. (See id., at 43-45.) In his declaration, Taylor provides the legal standard that forms the basis of his expert opinion. (See id., 74, ¶¶ 28-29.) Taylor also appears to rely heavily on Hueske's opinion regarding the forensic evidence, and comes to the conclusion that "Green was either grossly incompetent in his job, or was lying to cover-up for Officers Hoeppner and Hanlon." (See id., at 87.) Taylor further concludes that "Green . . . [and] other members of the Fort Worth Police Department conspired to cover-up the wrongful shooting death of Mr. Jerry Waller." (Id., at 89.) In that regard, Taylor opines that Green's investigative report was based on "awful investigative protocol" and that he did not act "as any other reasonable police detective" when investigating the officer-involved shooting. (Id., at 90.)

Plaintiffs have used two experts' sworn declarations in the form of expert reports in what appears to be an attempt to create a material fact question regarding the reasonableness of Green's investigation into the shooting of Waller. But reasonableness under a qualified-immunity analysis is a question of law not fact. *See Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir.1999)("Objective reasonableness is a matter of law for the courts to decide, not a

matter for the jury."). Hueske appears to be highly qualified to give his expert opinion on blood spatter and crime-scene reconstruction. Hueske's report does not comment on Green's investigation, but does give a forensic review of the evidence from the crime scene. Hueske's report may assist a factfinder in determining what likely happened in the garage, but does not address whether Green was reasonable in his investigation.

Taylor's report, however, does address the reasonableness of Green's actions, and is based on Taylor's review of the evidence and Hueske's report. Taylor outlines the legal standard in which he followed, (See Pls.' Appx. (doc. 177) 74-75), to conclude that Green's investigation was biased and that Green did not act as "any other reasonable police detective in the State of Texas in investigating this officer-involved shooting." (See id., at 90.) But as Defendants point out, Taylor cannot testify to a legal standard. *See* *U.S. v. Williams*, 343 F.3d 423 (5th Cir. 2003)(concluding that the district court committed error when it permitted an officer to testify to the reasonableness of the shooting because Federal "Rule [of Evidence] 704(a) 'does not allow a witness to give legal conclusions.'")(citation omitted).

Bearing in mind the above-referenced principles of qualified immunity, the Court must examine whether Green acted reasonably in conducting his investigation. And although "underlying historical facts [can] be in dispute that are material to the reasonableness

determination," *see Bramer*, 180 F.3d at 703, such is not the case here. The parties merely disagree on whether the facts show that Green acted unreasonably in his investigation, and thus, whether the unreasonable acts would show that he joined the alleged conspiracy to cover-up the Waller shooting. Plaintiffs allege that Green ignored the evidence and suggested answers to the accused officers while interviewing them. Plaintiffs also point to Green's allowing the officers' legal counsel to be present when he conducted the crime-scene walkthrough as support. Plaintiffs argue that the lawyers were present to assist with the cover up. And Plaintiffs further point to the officers' ability to speak with legal counsel before Green interviewed the officers at the Major Case Office as support for their cover-up claim.

Plaintiffs argue that the blood spatter and the wound on Waller's left hand should have alerted Green that the officers were being untruthful in their account of events. Therefore, Plaintiffs conclude, Green was incompetent in his failure to see what the evidence showed him, or that he knowingly tried to assist the officers in their cover-up efforts. Green, however, acknowledges the lefthand wound and declares:

> Assuming that the blood on his right palm is blood
> spatter, and also recognizing that the wounds to Waller's
> left hand are inconsistent with Waller holding a gun in
> his left hand at the time his hand was shot, does not
> mean that Waller could not have been holding a gun at the
> time a shot or shots were fired at him. I think a
> reasonable possibility is that Waller may have dropped

the gun as a shot or shots were fired at him, and before
his left hand was hit or right had received splatter. If
so, then one or both of his hands, which at one time held
a gun would have been empty while other shots were fired
at Waller by Officer Hoeppner.

(Defs.' Appx. (doc. 155) 199, ¶ 22.) In reviewing the interviews of

the officers, Green asked follow-up questions to have the officers

clarify their responses. Green further recognized the officers'

stories had some inconsistencies, but also concluded that the

stories generally matched. Green also questioned Hardin about why

he removed the gun from underneath Waller's body. Hardin claimed

that when he arrived, he found Hoeppner and Hanlon with their guns

still pointed at Waller, and that he was told that there was a gun

underneath Waller.    Hardin stated that he removed the gun to

"secure it" from someone not known to be dead yet. Plaintiffs

allege that the crime-scene photographs show no visible blood on

the gun, meaning that the gun could not have been under Waller's

body. (See Pls.' 2d Am. Compl. (doc. 45) 13, 77, 81.) But

Plaintiffs have included crime-scene photographs that appear to

contradict their claims and actually depict blood on the gun. (See

Pls.' Reply Appx. (doc. 150) 188-91, 193, 211.)

Plaintiffs further claim that blood was added to the gun and

its cartridges by contact with a bloody glove after the weapon was

taken to the crime lab. (See Pls.' Reply (doc 149) 20-21, 36; Pls.'

Reply Appx. at 188-89, 193.) But upon closer review of the crime-

scene photographs, there appears to be blood on the wooden handle

and metal screw as depicted from photographs taken at the crime scene. (See id. (doc. 150) 190, 211.) In that regard, the wooden handle appears to be wet and have a reddish tint to it, and the metal screw has what appears to be blood on it. There also appears to be very small spots of blood on the garage floor next to the gun's barrel, handle, and at the bottom-right of the picture. (See id., at 190, 211.) Further, Plaintiffs seem to ask the Court to infer that blood could not have gotten on the cartridges, but for contact with a bloody glove in the crime lab. (See id., at 189; Pls.' Reply (doc. 149) 36.) But the cartridges are clearly visible even when the revolver was closed as depicted from a photograph taken at the crime scene, meaning that blood could have reached the cartridges in another fashion. (See Pls.' Appx. 211.)

In Green's declaration, he notes that he found considerable blood deposits on the gun that was allegedly found underneath Waller. (See Defs.' Appx. (doc. 155) 200.) Green's declaration is supported by what is visible in the crime-scene photographs. The Court makes no opinion as to whether the evidence submitted shows that Waller was or was not holding a gun when shot. Those determinations are better left for a trier of fact. The Court has simply examined the evidence to determine if Plaintiffs have shown that Green acted unreasonably in conducting his investigation, and thus, whether an inference can be made in Plaintiffs' favor that Green joined a conspiracy to cover-up an unlawful shooting. Based

on the representations of the officers and the evidence, it was reasonable for Green to conclude that the officers' account of events was an accurate depiction. And upon completing his investigation, Green gave the evidence to the district attorney's office to examine and present the case to a grand jury. Plaintiffs have failed to show that Green acted objectively unreasonably in conducting his investigation of the shooting of Waller.

In sum, Green's investigative techniques appear to have been aimed at eliciting information from the officers involved at the crime scene, and his techniques were within the discretionary functions of his job. Qualified immunity is aimed at protecting officials when performing the discretionary functions of their job. *See Bramer*, 180 F.3d at 703. Plaintiffs may be able to show that Green made mistakes in conducting his investigation, but even so, an official who makes mistakes in performing his job is nevertheless entitled to qualified immunity. *See Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'")(citation omitted).

F.   State-Law Claims

In their amended complaints, Plaintiffs cite several provisions under Texas law, including: "art., I, §§ 8,9,13 and 19, and art. XVI § 26 [of the Texas Constitution,]" "the Texas Tort

Claims Act," "the Texas Declaratory Judgment Act," and "the Texas Wrongful Death Statute." (See generally, Pls.' Am. Compls. (docs. 41 & 45).) Under Texas law, police officers are entitled to official immunity on state-law claims for "'(1) the performance of discretionary duties (2) that are within the scope of the employee's authority, (3) provided that [they] act[ ] in good faith.'" *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012)(quoting *Telthorster v. Tennell*, 92 S.W.3d 457, 460–61 (Tex. 2002)). "Texas law of official immunity is substantially the same as federal qualified immunity." *Id*. "An officer acts in good faith if a reasonably prudent officer, under the same or similar circumstances, could have believed that the facts justified his conduct." *Id*. (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 656–57 (Tex.1994)). "Like the federal standard from which it is derived, Texas's good-faith test is one of objective legal reasonableness." *Id*. (citation omitted). Having already held that Green and Baggott acted objectively reasonably in performing their discretionary duties as detectives when investigating the shooting of Waller, the Court concludes that Green and Baggott are also entitled to official immunity under Texas law. As such, Plaintiffs' state-law claims against Green and Baggott are DISMISSED.

## IV. CONCLUSION

Based on the foregoing, the Court GRANTS Defendants' motion

for summary judgment (doc. 153) and concludes that detectives Green and Baggott are entitled to qualified immunity for all claims asserted against them.

SIGNED April 12, 2018.


_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE