# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **ANGIE WALLER; and** | § | |
| **CHRIS WALLER,** | § | |
| Plaintiffs, | § | |
| | § | |
| **TERRY WAYNE SPRINGER; and** | § | |
| **GAYLA WYNELL KIMBROUGH,** | § | |
| Intervenors, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 4:15-CV-670-P** |
| | § | |
| **CITY OF FORT WORTH TEXAS;** | § | |
| **and** | § | |
| **RICHARD A. HOEPPNER,** | § | |
| Defendants. | § | |

## AMENDED OPINION AND ORDER[1]

Around 1:00 a.m. on May 27, 2013, Fort Worth Police shot and killed a 72-year-old man in his own home. Police were responding to a burglary alarm at a house across the street. Due to multiple mistakes, they instead responded to Jerry Waller's house, shined their flashlights in his windows, and woke him up. Thinking his house was being burglarized, Waller grabbed his gun and headed to his garage to investigate. There, although the parties disagree how it occurred, an innocent man lost his life.

This is an undeniably tragic case. But under the law, the City can only be liable for Waller's death if its policies were the moving force behind the officer's use of excessive

---

[1]This Amended Opinion and Order replaces in its entirety the Opinion and Order issued in this case on January 22, 2021. ECF No. 389. This Amended Opinion and Order merely corrects non-substantive grammatical errors in the earlier Opinion and Order.

force. The City argues that—as a matter of law—the undisputed facts show that the policies Plaintiffs complain of—failure to verify addresses, protocol on burglary calls, and staffing shifts with rookies—are too attenuated to the officer's use of force. After considering the City's Motion for Summary Judgment (ECF Nos. 306–09), Plaintiffs' Response (ECF Nos. 346–47), the City's Reply (ECF No. 367), and applicable law, the Court, restrained by precedent, is duty bound to agree with the City. Therefore, the City's motion is **GRANTED.**

## BACKGROUND

### A.    Material Facts

Early in the morning on May 27, 2013, the Fort Worth Police Department (FWPD) dispatched first-year officers Hoeppner and Hanlon to respond to a burglary-alarm call. Pls.' MSJ App'x at 61, ECF No. 314-1. Under the City's policies, more experienced officers get first pick of shifts, and their first choice is rarely the midnight shift, so it is not unusual for two rookie officers to get sent to this type of call at this hour. *Id.* at 49–51. Unfortunately, the officers went to the wrong house. *Id.* at 62–63. Following their training, the officers walked around the house and scanned the perimeter with their flashlights. *Id.* at 22. Hanlon then went to the front door and left Hoeppner in the back near the open garage door. *Id.* at 62–63. When Hanlon reached the front door, he radioed Hoeppner to join him in the front. It was 1:06 a.m. *Id.* at 63–64.

According to Plaintiffs, the officers' flashlights awoke the homeowner, 72-year-old Jerry Waller. Waller got out of bed and, still shirtless and without shoes, walked into his garage holding his gun. *Id.* at 64. Hoeppner saw Waller enter the garage, approached the

2

garage with his gun aimed at Waller, shined his flashlight in Waller's eyes, and yelled repeatedly, "Drop the gun!" *Id.* at 63. Hearing the yells, Hanlon raced to the back of the house. *Id.* at 63–64. When he got there, he started yelling, "police!" or something similar. *Id.* at 64. After a few seconds of yelling, Waller put his gun on the trunk of the car in the garage. *Id.* Now defenseless, Waller raised his hands near his head and used his left hand to block the flashlight from his eyes. Despite Waller's hands being empty and raised in the air, Hoeppner fired six shots into Waller. Hanlon radioed dispatch that an ambulance was needed at 1:06:50 a.m. *Id.*

## B.   Procedural History

On May 26, 2015, Plaintiffs filed their complaint in federal court alleging claims under 42 U.S.C. § 1983. Originally, the suit named as defendants most of the investigating officers and the City. By June 20, 2016, following the Court's scheduling order (ECF No. 140), the officers filed motions to dismiss based on their qualified-immunity defense. Because qualified immunity is unavailable to municipalities, the proceedings did not include the City. On April 12, 2018, the Court issued orders dismissing all claims except Plaintiffs' excessive-force claim against Hoeppner and a conspiracy to cover-up a crime against several officers. ECF Nos. 200, 201. The Fifth Circuit affirmed the excessive-force claim but reversed and dismissed the conspiracy claim. *Waller v. Hanlon*, 922 F.3d 590 (5th Cir. 2019) (ECF No. 221).

After the interlocutory appeal, Plaintiffs' sole remaining § 1983 theories were (1) excessive-force against Hoeppner and (2) municipal-liability against the City. On July 25,

3

2019, Plaintiffs confirmed this in a court-ordered status report. ECF No. 228. Plaintiffs

described their claims against the City as follows:

> The Plaintiffs' claims against the City of Fort Worth are that it failed to properly train and supervise probationary and inexperienced officers knowing that their actions would lead to excessive use of force contrary to the Forth and Fourteenth Amendments to the U.S. Constitution and that the City and its policy making officials were consciously indifferent to police coverups, particularly when the officer uses excessive use of force.

Joint Status Report at 12–13, ECF No. 228. In the same report, Plaintiffs represented their

claim against Hoeppner as an excessive-force claim. Operating under these representations,

the parties conducted discovery until the deadline for dispositive motions, October 9, 2020

(*see* ECF No. 284), when both Plaintiffs and the City filed cross motions for summary

judgment regarding the City's liability. These motions are now before the Court.

## ANALYSIS

### A.    Plaintiffs' Claims

The analysis of Plaintiffs' claims starts by determining what their claims are.

Plaintiffs' summary-judgement briefing appears to argue for the City's liability under an

invasion-of-curtilage or unconstitutional-entry-on-land theory. Pls.' MSJ Brief at 8, ECF

No. 313. As the Court previously ordered, the only constitutional violation contained in

Plaintiffs' complaint relates to Hoeppner's use of excessive force. ECF No. 388 at 1–3. For

the reasons set out in that order, the Court maintains that Plaintiffs' pleadings only

implicate one constitutional violation: excessive force.

Plaintiffs' claims against the City likewise center on its approval of excessive force.

Their First Amended Complaint states that the City has "long been aware and publicly

discussed this excessive use of force by probationary officers . . . ." Pls.' 1st Amend. Cmp't

at ¶ 110, ECF No. 41. Again, Plaintiffs state that the City's "tolerance and approval of this use of excessive force is the custom and policy of the City of Fort Worth." *Id.* at ¶ 124; *see also* ¶¶ 125, 127, 128, and 132. Nowhere does Plaintiffs' complaint allege problems with the City's policies concerning invasion of curtilage or burglary-call protocol. Moreover, about 17 months ago, Plaintiffs specifically complained that the City's policies "lead to excessive use of force . . . ." Joint Status Report at 12–13, ECF No. 228. These representations are due respect, and the City was entitled to rely on them for discovery and summary-judgment briefing. *See Boswell v. Hon. Gov. of Tex.*, 138 F. Supp. 2d 782, 786 (N.D. Tex. 2000) (Mahon, J.) (finding that the confusing nature of plaintiffs' claims "forces [d]efendants to speculate as to the nature of [p]laintiffs' causes of action, handicapping [d]efendants and making them unable to defend themselves").

For these reasons, Plaintiffs' complaints about the City's policies are limited to those relating to Hoeppner's use of excessive force. Although there is a genuine dispute whether Hoeppner used excessive force (ECF No. 388), for purposes of this order, the Court assumes that Hoeppner in fact used excessive force.

## B.    Summary-Judgment Standard

Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c)(1). A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue as to a material fact is genuine "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham."). To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must show that the evidence is sufficient to resolve issues of material fact in his favor. *Anderson*, 477 U.S. at 249.

When evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Id.* at 255. However, it is not incumbent upon the Court to comb the record in search of evidence that creates a genuine issue as to a material fact. *See Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party must cite the evidence in the record that establishes the existence of genuine issues as to the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

## C.   Municipal Liability

In this case, the City did not violate Waller's constitutional right to be free of unreasonable seizure through excessive force—its employee, Officer Hoeppner, did. Under § 1983, a municipality cannot be liable, under the doctrine of *respondeat superior*, for merely employing a person that violated someone's rights. *Monell v. Dep't of Social Servs.*,

6

436 U.S. 658, 691 (1978). Rather, a municipality, such as the City, can be liable under 42 U.S.C. § 1983 only for its own acts. *See Connick v. Thompson*, 563 U.S. 51, 59 (2011). "To hold a municipality liable under § 1983 for misconduct of an employee, a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the municipality's policymaker was the moving force behind, or actual cause of, the constitutional injury." *James v. Harris Co.*, 577 F.3d 612, 617 (5th Cir. 2009).

This standard has developed specific requirements regarding the causal link between the policy and the constitutional violation and the municipality's culpability in enacting the policy. These requirements must be rigorously enforced. *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018). "These requirements must not be diluted, for where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability." *James*, 577 F.3d at 618.

Plaintiffs argue that the City should be held liable for the following five policies:

(a) the City did not require its police officers to visually verify the address to which they had been dispatched on the scene;

(b) the City did not properly train its officers that there are odd-numbered addresses on one side of the street and even on the other;

(c) the City did not and does not require its officers to verbally identify themselves when confronting citizens and prior to using deadly force;

(d) the City policy is to allow its officers to enter and search the curtilage of residences without contacting or receiving permission of the homeowner; and

(e) the City had a policy of generally pairing rookie police officers with other rookie police officers after short field training experience and thus failing to provide sufficient supervision of the younger/inexperienced officers.

7

Pls.' MSJ Resp. at 2, ECF No. 346. For purpose of this order, the Court assumes these policies existed and were promulgated by the correct policymaker. The Court makes these assumptions not because they are necessarily true, but because it is unnecessary to wrestle with those difficulties. For the independent reasons below, the City cannot be liable for these alleged policies.

   1. None of the policies or customs were "moving forces" in Hoeppner's use of
      excessive force.

The first requirement that must not be diluted concerns the causal link between the policy and the constitutional violation. Originally, the Court stated the policy or custom must be a "moving force" in the plaintiff's constitution violation. *Monell*, 436 U.S. at 694. Since then, the Fifth Circuit has interpreted this phrase as requiring the plaintiff to "show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." *Alvarez*, 904 F.3d at 390. This requires "more than a mere 'but for' coupling between cause and effect." *Fraire v. City of Arlington*, 957 F.3d 1268, 1281 (5th Cir. 1992).

In this case, the constitutional violation was Hoeppner's excessive use of force. This is key because "there must be a direct causal link between the municipal policy and the constitutional deprivation." *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). In an excessive force case, the issue is whether the officer's use of force was reasonable. *Graham v. Connor*, 490 U.S. 386, 394–96 (1989). It is well-established that officers are justified in using deadly force whenever they reasonably fear serious bodily harm. *See e.g.*, *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) ("An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer

reasonably believes that the suspect poses a threat of serious harm to the officer or to others."). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Importantly, the inquiry focuses on the officer's decision to use deadly force, therefore "any of the officer's actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in [the Fifth] Circuit." *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014).[2]

Identifying the constitutional violation focuses the analysis. Hoeppner's decision to use excessive force occurred in the time between Hanlon's first radio call, before any yelling, and his second radio call for an ambulance—44 seconds. Therefore, any acts or events before that time are immaterial. It follows that the Court must ignore the case's most disturbing fact—that the officers were at the wrong house. The Court must focus solely on policies that would have affected Hoeppner's judgment in those 44 seconds.

Four of the policies (policies (a), (b), (d), and (e)) do not impact Hoeppner's thinking or judgment during those 44 seconds. They do no more than set the stage for the events

---

[2]The Fifth Circuit has applied this principle numerous times. *See e.g.*, *Rockwell v. Brown*, 664 F.3d 985, 992–93 (5th Cir. 2011) (holding that circumstances leading up to use of force were irrelevant and stating that the court "need not look at any other moment in time"); *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001) ("The excessive force inquiry is confined to whether [the officer or another person] was in danger *at the moment of the threat* that resulted in [the officer's use of deadly force].") (emphasis added); *Fraire*, 957 F.2d at 1276 ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, *at that moment*, that there was a threat of physical harm.") (emphasis added).

that followed. These policies may be "but for" causes, but they are not the moving force behind Hoeppner's use of force. These policies are described below.

*First*, the policies concerning addresses (policies (a) and (b) above) are irrelevant because they would only have affected Hoeppner's acts before the shooting. *Harris*, 745 F.3d at 772 ("any of the officer's actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry"). Although the officers' errors and the City's failure to have a policy aimed at reducing such errors are clear and worthy of blame, they did not contribute to Hoeppner's use of excessive force.

*Second*, the City's policy of entering a house's curtilage is also irrelevant. That policy may be a "but for" cause for the shooting, but that is insufficient. *Fraire*, 957 F.3d at 1281 (causation requires "more than a mere 'but for' coupling between cause and effect"). How and why Hoeppner was there are irrelevant. The question is, once there, was Hoeppner's use of force reasonable? And this policy does not make either answer more likely. This policy has no "direct causal link" to Hoeppner's decision making. *See Alvarez*, 904 F.3d at 390 (stating plaintiff must show "a direct causal link between the policy and the violation").

*Finally*, the City's policy of staffing rookie officers on the night shift cannot be a moving force of Hoeppner's use of excessive force. Plaintiffs argue that the policy causes problems because there are no senior officers around to help train or supervise the younger officers. Pls.' MSJ App'x at 51. But when Hoeppner met Waller in the garage, one-on-one, early in the morning, both armed with guns, there was no time for additional training. This was the moment his training was put to the test. The experience level of the officer running

10

around the house as back up is irrelevant. Although a more experienced officer may have

avoided getting Hoeppner in that difficult position, that hypothetical is irrelevant. *Harris*,

745 F.3d at 772 ("any of the officer's actions leading up to the shooting are not relevant

for the purposes of an excessive force inquiry"). Again, this policy could not have affected

Hoeppner during the material time.

   The last policy Plaintiffs identify, which gives officer's the option of verbally

identifying as police as opposed to requiring it, fails to meet "but for" causation standards.

*First*, there is undisputed evidence that Hanlon did verbally identify as police. Pls.' MSJ

App'x at 64. *Second*, the goal of identifying as police is to achieve cooperation. In this

case, that meant getting Waller to put down the gun. But Waller did put down his gun.

Plaintiffs argue Hoeppner still shot. Accordingly, even if Hoeppner had verbally identified

himself, it would not have changed the outcome. *Finally*, this policy, like the others, is not

concerned with use of excessive force. An officer has the right to defend himself if he is

reasonably threatened. When an officer reasonably fears for his life, there may be no time

to identify as police. Of course, Plaintiffs argue that Hoeppner did not fear for his life and

that he shot a defenseless Waller. But if Hoeppner shot an unarmed man, why wouldn't he

also violate a policy of identifying himself? This policy did not have any impact on

Hoeppner's decision making in the relevant 44 seconds.

   For these reasons, none of the identified policies have the required "direct causal

link between the municipal policy and the constitutional deprivation." *Piotrowski*, 237 F.3d

at 580. Accordingly, Plaintiffs "failed to provide evidence to the demanding standards

required by *Monell* and its progeny to hold the City liable." *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009).

> 2. <u>The City did not enact the policies or customs with deliberate indifference to the known or obvious consequences that use of excessive force would result.</u>

Even if Plaintiffs could demonstrate a fact issue on causation, or if they had pleaded an invasion-of-privacy violation, their arguments would still fail because the policies were not enacted with the requisite culpability. This is the second requirement that "must not be diluted." *Alvarez*, 904 F.3d at 390.

For the City to be liable, the policy must be either facially unlawful or, if the policy is facially lawful, enacted with "deliberate indifference as to its known or obvious consequences." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409–10 (1997). This is "a **stringent** standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (emphasis added). It is a "degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *James*, 577 F.3d at 617–18. The policymaker must have "actual knowledge of the facts showing that a risk of serious harm exists as well as the [policymaker's] having actually drawn that inference." *Brown v. Callahan*, 623 F.3d 249, 255 (2010). The burden to show deliberate indifference falls on Plaintiffs. *Peterson*, 588 F.3d at 351–52. "Proof of deliberate indifference normally requires a plaintiff to show a pattern of violations." *Brown*, 623 F.3d at 255.

12

### a.  *Policies (a) and (b) – Failure to Train Officers on Addresses*

Regarding the failure to verify addresses or train officers regarding address numbering, Plaintiffs fail to cite any evidence that suggests the City enacted the policies with deliberate indifference. Plaintiffs failed to establish any pattern of prior problems. Plaintiffs asked then-Chief Kraus if he was aware that Fort Worth Police had responded to the wrong address before. He testified, "I'm not aware, but its reasonable." Pls.' MSJ App'x at 24. This is insufficient to raise a fact issue that the City enacted the policy with deliberate indifference to constitutional violations. *See James*, 577 F.3d at 617–18 (requiring policy maker to have "actual knowledge of the facts showing that a risk of serious harm exists").

Moreover, once the City became aware of their policies' deficiency, it corrected both training issues. After this incident, the City drafted a "Critical Police Incident" Report. Pls.' MSJ App'x at 70. The Report identified both issues as training deficiencies. *Id.* Apparently, this used to be required training but—for unknown reasons—fell off the City's syllabus. Pls.' MSJ App'x at 27. By July 30, 2013, these items were already added to the City's officers' training. *Id.* There is no evidence how or why it fell off, but it is Plaintiffs' duty to bring that evidence. *Peterson*, 588 F.3d at 844. Without additional evidence, it appears to be, at most, negligence. *James*, 577 F.3d at 617–18 (requiring municipal liability to be "beyond mere negligence or even gross negligence."). This does not show deliberate indifference.

b.   _Policy (c) – Failure to Verbally Identify_

Next, Plaintiffs argue that the City's policy giving officer's the option to verbally identify themselves as police, as opposed to requiring it, was enacted with deliberate indifference to the obvious risk that the highly probable outcome would be its officers' use of excessive force. *See Peterson*, 588 F.3d at 850. There is no evidence to support this. Plaintiffs cite then-Chief Kraus's testimony that the City's policy required officers to identify themselves as police through their uniform, identifiable markings, or "verbal identification." Pls.' MSJ App'x at 15. Kraus admitted that "ideally [Hoeppner] would [have] identified himself, but it was reasonable for him to demand that Mr. Waller put the weapon down." *Id.* at 38. All this shows is that the policy provides officers discretion, which seems reasonable when an officer's life is in danger. The Court determines that this evidence fails to raise a fact issue that the City was deliberately indifferent. Further, Plaintiffs did not attempt to show that this policy had resulted in any prior constitutional violations. *See Brown*, 623 F.3d at 255 ("Proof of deliberate indifference normally requires a plaintiff to show a pattern of violations."), and *Peterson*, 588 F.3d at 851–52 (holding that 27 prior excessive-force complaints in three years failed to establish a pattern). Without further evidence to support this requirement, Plaintiffs failed to raise a fact issue on whether the City enacted the policy with deliberate indifference.

c.   _Policy (d) – Curtilage_

Next, Plaintiffs argue that the City's policy on residential burglary calls was unlawful. For these calls, the City's custom was to survey the house and surrounding area before contacting the occupants. Pls.' MSJ App'x at 22. Plaintiffs first argue this is facially

14

unlawful. *See e.g.*, *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (stating that the Fourth Amendment protects the home and the curtilage—area immediately surrounding the home) (internal quotations omitted). It is true that the area around a house is protected, but police have long had authority to enter a house's curtilage—or even a dwelling—to provide aid. *See e.g.*, *Wayne v. U.S.*, 318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J.) ("The need to protect or preserve life or to avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."). Here, the City's policy only allowed officers to search the house's curtilage on suspicion of burglary. In such a situation, the Supreme Court has authorized police to enter a house and stated that "it would be silly to suggest that the police would commit a tort by entering [a dwelling] . . . to determine whether violence (or the threat of violence) has just occurred or is about to (or soon will) occur . . . ." *Georgia v. Randolph*, 547 U.S. 103, 118 (2006). In this case, the officers were at the wrong house, but that is not the policy's fault. The officers negligently carried out the policy. For this reason, the Court finds the policy is facially lawful.

The only evidence Plaintiffs cite to support the City enacted this policy with deliberate indifference is an incident that occurred over five years after this incident. But this single incident does not show a pattern. *See Brown*, 623 F.3d at 255 ("Proof of deliberate indifference normally requires a plaintiff to show a pattern of violations."). Without more, two bad outcomes fail to show that it should have been obvious to the City that the use of excessive force was the policy's "highly predictable consequence." *Id.* at 849. Liability requires "sufficiently numerous ***prior*** incidents, as opposed to isolated instances." *Id.* at 851 (internal quotations omitted) (emphasis added). And finally, the other

15

incident Plaintiffs cite occurred *after* this incident, not before. It could not provide notice anyway. Therefore, Plaintiffs failed to raise a fact issue.

### d.   *Policy (e) – Pairing Rookie Officers*

Last, Plaintiffs argue that the City's policy of pairing rookie officers together supports the City's liability. The policy allows more senior officers to pick shifts before more junior officers. But the policy's effect is to fill the midnight shift with rookie officers. Pls. MSJ App'x at 50. This is facially lawful, and Plaintiffs fail to cite to any evidence that the City enacted the policy when it was obvious that the policy's highly predictable outcome would be the use of excessive force.

Plaintiffs try to support this argument with three pieces of evidence. *First,* Plaintiffs again try to show a pattern with the same incident discussed above that occurred five years after this incident. For the reasons stated above, this is insufficient. *Second*, Plaintiffs cite a police-body-camera company's promotional video, showing a former FWPD Chief discuss a 2013 incident involving rookie cops using excessive force. *Id.* at 49–50. But when asked whether he was aware of this incident, Krause said, "no, sir." *Id.* at 50. It cannot be said that a policymaker is indifferent to something he is unaware of. *Last*, Plaintiffs cite then-Chief Kraus's deposition testimony. When asked whether this policy has caused problems regarding the use of excessive force, Kraus said, "I don't know that I can make that, paint that broad a brush that that is leading to uses of force." Pls.' MSJ App'x at 50. Then, when asked if the problem with putting mostly rookie officers on the same shift is the lack of experience, Kraus admitted that "that is the argument against [the policy], yes." *Id.* at 51.

Together, this evidence fails to show that the City's policy was enacted with deliberate indifference. At most, Plaintiffs cite two other incidents. For the reasons above, this is insufficient to raise a fact issue. *See Peterson*, 588 F.3d at 851–52 (holding that 27 prior excessive-force complaints in three years failed to establish a pattern). Further, it is not clear the City's policymaker was even aware of those incidents. *See James*, 577 F.3d at 617–18 (requiring policy maker to have "actual knowledge of the facts showing that a risk of serious harm exists").

3.   The City did not ratify Hoeppner's use of excessive force.

Alternatively, Plaintiffs argue that, even if the policies were not enacted with deliberate indifference, the City ratified Hoeppner's use of excessive force. *See Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985). Plaintiffs rely on the City's failure to discipline Hoeppner for the shooting. Pls.' MSJ App'x at 44. Although there is authority allowing a municipality to be liable after a single incident, it is limited to "extreme factual situations." *Peterson*, 588 F.3d at 848. For example, in *Grandstaff*, police chased a suspect onto Grandstaff's rural property. *Id.* at 165. The police knew innocent people lived on the property. *Id.* at 167–68. When Grandstaff drove to the police, coming from a different direction than the suspect's abandoned car, the police "poured their gunfire at the truck and into the person of James Grandstaff." *Id.* at 168. Afterwards, the "officers and their supervisors denied their failures and concerned themselves only with unworthy, if not despicable, means to avoid legal liability." *Id.* at 166. The Fifth Circuit held that the City's acts were so obviously reprehensible that the failure to admit any error ratified a policy of excessive force. *Id.* at 171.

17

But this case is not such an "extreme factual situation." *See Snyder v. Trepagnier*, 142 F.3d 791 (5th Cir. 1998) (refusing to find ratification when officer shot a fleeing suspect in the back); *and Peterson*, 588 F.3d at 843–44 (refusing to find ratification when officers dragged a sleeping drunk out of a car and beat him until his femoral artery ruptured). Here, Hoeppner's acts, in the light most favorable to Plaintiffs, are comparable to shooting a fleeing suspect in the back, and that is not extreme enough. Moreover, the City performed a follow up investigation and made changes to their policies. This does not amount to a ratification of excessive force. This holds true even if the jury later finds Hoeppner used excessive force. *Peterson*, 588 F.3d at 848 (stating that "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality").

## CONCLUSION

For these reasons, the Court concludes that the policies Plaintiffs identify fail to provide a basis for the City's liability. This case is tragic and the circumstances of Mr. Waller's death are absolutely heartrending. This order is in no way an approval of the City's policies. The Court merely finds that Plaintiffs failed to produce evidence sufficient to raise a fact issue regarding the demanding standards required in establishing municipal liability. Accordingly, the City's motion must be **GRANTED.**[3] And for the same reasons, Plaintiffs' motion for summary judgment (ECF No. 313) is **DENIED.**

---

[3]In reaching this holding, the Court notes its agreement with Judge Edward C. Burks of the Supreme Court of Virginia, who in 1878, writing in an equally heartrending opinion, stated:

**SO ORDERED** on this **25th day** of **January, 2021.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

---

> The unhappy condition of the appellee excites my commiseration; but courts of justice are not allowed to be controlled in their decisions by considerations of that character. "Compassion," said an eminent Virginia chancellor, "ought not to influence a judge, in whom, acting officially, apathy is less a vice than sympathy."

*Harris v. Harris*, 72 Va. 13, 32 (1878) (quoting Chancellor George Wythe, Commentary on *Field's Ex'x v. Harrison & wife, in* WYTHE'S REPORTS 282 (Minor's Ed. 1794)).

The Court is also reminded of an apropos observation by another prominent Virginia jurist, Brockenbrough Lamb:

> We regret that the conclusion reached will prevent a recovery and may thereby defeat the ends of justice in the particular case before us, but however that may be, we must declare the law as we find it written and comfort ourselves with the confident belief that in its results it will promote the ends of justice to all.

Brockenbrough Lamb, *The Duty of Judges: A Government of Laws and Not of Men*, *in* HANDBOOK FOR JUDGES 93 (Donald K. Carroll ed., 1961).